IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ERIC WILHOIT, II,<br><br>Defendant. | Case No. 1:22-cr-00191-AJT-1 |

**MEMORANDUM OPINION AND ORDER**

Petitioners Eric Wilhoit, Sr. and Chastity White ("Petitioners") have filed a Petition (the "Petition"), [Doc. No. 198], asserting their ownership over the $195,000 that was seized during a search of their residence on July 22, 2022, and included in two Consent Orders of Forfeiture entered against Defendants Odyssey Wilhoit and Jeremiah Wilhoit and a Preliminary Order of Forfeiture entered against Defendant Eric Wilhoit, II (collectively, "the Forfeiture Orders"). [Doc. Nos. 150 (Odyssey Wilhoit), 176 (Jeremiah Wilhoit), 190 (Eric Wilhoit, II)]. In response, the Government has filed a Motion to Strike the Petition for Failure to Comply with Civil Discovery. [Doc. No. 247] (the "Government's Motion to Strike"). The Court held an ancillary hearing on the Petition and the Government's Motion to Strike on July 9, 2026, following which it took both the Petition and the Government's Motion to Strike under advisement, pending receipt and review of the parties' proposed findings of fact and conclusions of law. Upon consideration of the parties' filings, the evidence presented at the hearing, and the argument of counsel at the hearing, the Motion to Strike is **GRANTED**, and the Petition is **DENIED** and in support of that ruling, the Court issues the following Findings of Fact and Conclusions of Law.

## I. BACKGROUND

On June 10, 2021, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and the Drug Enforcement Administration ("DEA") executed a search warrant on the Petitioners' residence located at 6378 Olive Court, Woodbridge, Virginia 22193-7011 (the "Olive Court Residence") to search for evidence of controlled substances (the "First Search"). [Doc. No. 241-1]. After the First Search, the Government confiscated $113,280.00, ten firearms, and a variety of gun ammunition and magazines. [Doc. Nos. 241-3, 241-4]. Subsequently, the DEA initiated a forfeiture proceeding for the seized property, and the Petitioners only contested forfeiture of the seized $113,280.00 and do not appear to have filed a petition for the return of the guns, ammunition, or magazines. *See* [Doc. No. 241] at 2; [Doc. No. 241-4] at 3–4; [Doc. No. 241-5] at 5. On November 24, 2021, without any formal adjudication of the Petitioners' legal right to the seizure funds, the DEA informed the Petitioners that it would return $105,457.93 of the seized funds to Petitioners, [Doc. No. 241-7], which it did on February 2, 2022, by way of two deposits into Petitioner Chastity White's Wells Fargo checking account, No. 2109 (the "2109 Account"). Gov't Exs. ("GE") 10-1, 10-2.[1]

Through another investigation, federal agents had evidence that Petitioners' children, Odyssey Wilhoit, Jeremiah Wilhoit and Eric Wilhoit, II, and Petitioners' nephew, Dejhaun Wilhoit (collectively the "defendants") were engaged in an extensive fraud scheme, and on July 27, 2022, based on evidence that some of the defendants resided with Petitioners for some period of time during the suspected fraud scheme and that the Olive Court Residence's address may have been used in connection with the fraud scheme, federal agents executed another search on the Olive Court Residence (the "Second Search"), during which they seized $195,000 and various weapons

[1] References to Gov't Ex. are to the government exhibits admitted into evidence at the July 9, 2026, hearing.

and ammunition ("the Property"). GE 20-4, 20-5. Subsequently, the defendants were indicted on, and pled guilty to, various fraud charges.[2] *See* [Doc. No. 2]; [Doc. No. 233] ¶¶ 20, 22, 24. In the Statement of Facts entered in connection with these criminal proceedings, the defendants admitted that they derived between $550,000 and $1,500,000 from their fraud scheme. *See* [Doc. Nos. 80, 89, 94, 97]. After the defendants pled guilty, the Court entered the Forfeiture Orders, which provided for the forfeiture of the seized Property. [Doc. Nos. 150, 171, 176, 190].

In the Petition filed pursuant to 21 U.S.C. $853(n), Petitioners assert their ownership over the $195,000 in U.S. currency seized from the Olive Court Residence on July 27, 2022, and 11 firearms seized from the Olive Court residence on July 27, 2022, along with associated magazines and ammunition,[3] and demand their return. [Doc. No. 198].

Pursuant to Federal Rule of Criminal Procedure 32.2 and 21 U.S.C. § 853, this Court convened an ancillary hearing on the Petition on July 9, 2026. [Doc. No. 279]. At the outset, the Court heard argument on, and ultimately denied Petitioners' Motions for Claim Preclusion, [Doc. Nos. 241, 255], which was based on the return of the previously seized $105,457.93. Next, the Court heard argument on and reserved decision on the Government's Motion to Strike, [Doc. No. 247], which was based primarily on Petitioner Eric Wilhoit, Sr.'s refusal to comply with discovery orders and his refusal to answer certain questions during his deposition about his income and tax filings based on his Fifth Amendment privilege. The Government also moved to remove three

[2] All four defendants pled guilty to at least one count against them. *See* [Doc. Nos. 88, 91, 93, 96]. The charges stemmed from two overarching conspiracies: one that involved stealing checks out of mailboxes using an "arrow key"—a master key for all United States Postal Service mailboxes—and another fraud scheme involving the temporary unemployment benefits program related to the COVID pandemic. [Doc. No. 65]; *see also* [Doc. No. 2] ⁋⁋ 13–19.

[3] The associated magazines and ammunition Petitioners claim an interest over in the Petition include the following: (1) One Windham Weaponry Model WW-15 Multi Cal. S/N YE016142; (2) One Fabrica de Armas Oviedo 1922 s/n E9909; (3) One 30-30 Winchester repeating s/n 3500933; (4) One Winchester Bolt, Model 67-22 Short; (5) One Glock .357 s/n WRY404; (6) One American Tactical Omni Hybrid Multi Caliber s/n NS071548; (7) One Glock 19 Gen 5 s/n BSKP78; (8); One Shotgun Sears model 200 12-GA, s/n, P124593; (9) One Hammerli Cal .357 Special Stahl s/n C2226 (12); (10) One Revolver Rohm GMBA Southern Br, Cal .32 S&W Long, s/n 42824; and (11) One Springfield Armory SA-XD BA338444.

firearms[4] from the Forfeiture Orders, which the Court granted, and entered an order vacating three firearms for forfeiture. The Petitioners conceded the forfeitability of the remaining eight firearms and ammunition seized at the Olive Court residence. [Doc. No. 282] at 94.[5] As a result, the only remaining Property at issue is the $195,000 in U.S. Currency seized from the Petitioners' residence on July 27, 2022.

## II. LEGAL STANDARD

### A. The Scope of a Third-party Ancillary Proceeding Contesting Forfeiture

21 U.S.C. § 853(n) allows a third-party to "petition the court for a hearing to adjudicate the validity of [its] alleged interest in [criminally forfeited] property." 21 U.S.C. § 853(n)(2). "[T]he function of ancillary forfeiture proceedings is to resolve third-party claims of ownership." *United States v. Cox,* 575 F.3d 352, 358 (4th Cir. 2009). Under Section 853(n), in order to prevail in the ancillary proceeding, a third-party claimant must establish by a preponderance the following:

> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
>
> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section.

21 U.S.C.§ 853 (n)(6)(A)–(B). A "preliminary order of forfeiture cannot become final until after

[4] Those firearms are: (1) a Glock .357 S/N WRY404; (2) an American Tactical Omni Hybrid Multi Cal S/N NS071548; and (3) a Glock 19 Gen 5 BSKP786.

[5] At the hearing, Petitioners also moved for a continuance of the hearing on the grounds that they wanted to call as witnesses, or alternatively, introduce the affidavits of, the defendants, all of whom are incarcerated, who would testify or declare that the $195,000 was not derived from their fraud scheme and belonged to the Petitioners. The Court denied the continuance motion on the grounds that (1) the proffered testimony would conflict with the consent forfeiture orders that the defendants consented to, and therefore would constitute inadmissible evidence or, at least, evidence with little, if any probative value; and (2) the proffered affidavits would be inadmissible hearsay. *See* [Doc. No. 282] at 24–25.

the ancillary proceeding concludes," and following the conclusion of the ancillary proceeding, "the court must enter a final order of forfeiture by amending the preliminary order as necessary to account for any third-party rights." *United States v. Oregon*, 671 F.3d 484, 488 (4th Cir. 2012).

Because the ancillary proceeding is not part of sentencing, the Federal Rules of Evidence apply. Fed. R. Crim. P. 32.2(c)(4); *see* Fed. R. Crim. P. 32.2 advisory committee's note to 2000 adoption, subdivision (b). Both Petitioners and the United States may present evidence and witnesses at the ancillary hearing. 21 U.S.C. § 853(n)(5). In addition, "the court shall consider the relevant portions of the record of the criminal case which resulted in the order of forfeiture." 21 U.S.C. § 853(n)(5); *see also United States v. Morgan*, 224 F.3d 339, 345 (4th Cir. 2000) (stating that district court properly considered the evidence and testimony presented in the criminal trial and the jury's verdict, as well as the petition filed in the ancillary proceeding, the government's response, and the evidence presented in the hearing).

**B. Rule 37 Sanctions**

Pursuant to Fed. R. Civ. P. 37(b), where a party "fails to obey an order to provide or permit discovery" the Court may either "strik[e] pleadings in whole or in part" or "dismiss[] the action or proceeding in whole or in part." Fed. R. Civ. P. 37(b)(2)(A)(iii), (v). The Court has wide discretion in determining whether to issue discovery sanctions under Rule 37. *S. States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 595 (4th Cir. 2003)). However, that discretion is not "without bounds or limits," *Wilson v. Volkswagen of Am.*, 561 F.2d 494, 503 (4th Cir. 1977), and when considering whether to sanction a litigant, a four-part test guides this Court's discretion:

> (1) whether the noncomplying party acted in bad faith;
> (2) the amount of prejudice his noncompliance caused his adversary, which necessarily includes an inquiry into the materiality of the evidence he failed to produce;
> (3) the need for deterrence of the particular sort of noncompliance; and
> (4) the effectiveness of less drastic sanctions.

*Id.* at 503–06.

## III. FINDINGS OF FACT

1. Petitioners Eric Wilhoit, Sr. and Chastity White have three children: Eric Wilhoit II, Jeremiah Elijah Wilhoit, and Odyssey Haleemah Wilhoit. GE 1 at 11.
2. All three of the Petitioners' children pled guilty to conspiracy to commit mail and wire fraud. [Doc. Nos. 79 (Eric Wilhoit, II), 87 (Odyssey Wilhoit), 92 (Jeremiah Wilhoit)]. Jeremiah Wilhoit and Odyssey Wilhoit also pled guilty to conspiracy to commit bank fraud, and Odyssey Wilhoit pled guilty to a substantive bank fraud count. [Doc. Nos. 88 (Odyssey Wilhoit Plea Agreement), 93 (Jeremiah Wilhoit Plea Agreement)]. One additional defendant, Dejhaun Wilhoit, Petitioners' nephew, pled guilty to one count of conspiracy to commit mail, wire, and bank fraud and one count of possession of a firearm by a convicted felon. [Doc. No. 96].
3. In the Forfeiture Orders entered in connection with those criminal proceedings, the Court found that the $195,000 seized from the Olive Court residence was proceeds of the defendants' offenses on which they had been convicted. [Doc. Nos. 150, 176, 190].
4. The defendants' underlying wire fraud conspiracy spanned from May of 2020 to January of 2022, [Doc. No. 65], and the underlying bank fraud conspiracy occurred from December of 2020 to March of 2021. *Id.*
5. As set forth in the Indictment, the defendants, through their participation in the underlying wire fraud conspiracy, obtained cash by applying for and obtaining unemployment insurance benefits in the State of Virginia. *Id.* Those funds were deposited on Way2Go cards, and the defendants would withdraw those funds in cash from the Way2Go cards. The defendants who were convicted of the underlying bank fraud conspiracy obtained cash

by depositing fraudulent checks into bank accounts and then withdrawing cash. [Doc. No. 282], 07/21/26 Tr. at 135–36 (B. Frohnapfel).

**Law Enforcement Seized $113,280 from the Olive Court Residence in June 2021**

6. On June 10, 2021, a search warrant was executed at the Olive Court Residence as part of law enforcement's investigation into defendants' illegal drug distribution activities (the "First Search"). As part of the First Search, law enforcement seized $113,280 in U.S. Currency. [Doc. No. 282], 07/21/26 Tr. at 53 (E. Wilhoit, Sr.); *id.* at 98 (A. Oakley); *id.* at 106 (A. Russell); GE 10-1, 60-3, 60-4, 60-5, 60-6, 60-7, 60-8, 60-9, 60-10.

7. During the First Search, law enforcement also seized, among other items, a document from the Virginia Employment Commission for T.T. and debit cards in the name of Jeremiah Wilhoit. GE 60-12, 60-13.

8. Between June 11, 2021, and June 13, 2022, following the First Search, Eric Wilhoit, II, Odyssey Wilhoit, and Dejhuan Wilhoit exchanged a series of text messages that in substance evidenced that they claimed owned the property seized during the First Search as well as their recognition of shared culpability. *See* [Doc. No. 282], 07/21/26 Tr. at 138–41 (B. Frohnapfel); GE 40-4 at 2296 (talking about converting cash into "investments"), 2298 (referencing losing money including "6 figures in 10 mins"), 2300 ("ain't nobody bout to point the finger at nobody or nobody boutta act like nobody perfect in this one point blank period everybody done did wrong either to dad house around dad house in dad house"), 2301 ("Like we gotta all figure somn out together legitly we was posed to been figured legit shut out ody posed to been the face of da legit shut caz she a female Nd we was been posed to make ourselves untouchable wat I mean by that is make our money untouchable by having legit shut wit paperwork").

9. On July 24, 2021, Petitioner Chastity White sent a text message to Odyssey Wilhoit that contains two photos of the Notice of Seizure pertaining to the $113,280 seized during the First Search. [Doc. No. 282], 07/21/26 Tr. at 140, 144 (B. Frohnapfel).

**Law Enforcement Returned $105,000 to Petitioners in February 2022**

10. On February 2, 2022, $105,457.93 of the $113,280 seized during the First Search was returned to the Petitioners through two deposits (48,817.93 and $56,640) into Petitioner Chastity White's Wells Fargo checking account #2109 ("the 2109 account"). GE 10-1, 10-2, 10-3, 30-4, 40-8; [Doc. No. 282], 07/21/26 Tr. at 106–09 (A. Russell); *id.* at 126, 127–28 (D. Lawhorn); *id.* at 140, 144 (B. Frohnapfel).

**The FBI Searched the Olive Court Residence and Seized $195,000 from the Olive Court Residence on July 27, 2022**

11. On July 27, 2022, as part of law enforcement's investigation into defendants' fraud schemes, the Federal Bureau of Investigation (FBI) searched the Olive Court Residence and seized a number of items, including $195,000 in U.S. Currency ("the Second Search"). GE 20-4, 20-5.

12. During the Second Search, the FBI found dozens of envelopes from the Virginia Employment Commission addressed to individuals other than Petitioners Eric Wilhoit, Sr. and Chastity White and their children. GE 20-8, 20-9, 20-10, 20-11, 20-12, 20-25.

13. The FBI also recovered during the Second Search (1) blank check stock; (2) economic impact payments in the names of individuals other than Petitioners and their children; and (3) Way2Go cards in the names of Petitioner Chastity White and Jeremiah Wilhoit. GE 20-13, 20-14, 20-15, 20-16, 20-17, 20-19, 20-21; [Doc. No. 158-3 (Declaration of FBI Special Agent Christian Roccia in support of Government's Motion for a Preliminary Order of Forfeiture)].

**The cash seized in the Second Search cannot be traced to the cash seized in the First Search.**

14. Contrary to Petitioner Chastity White's deposition testimony that from 2005 to 2022, she only had one bank account, GE 2 at 18, Four Wells Fargo bank accounts existed in Petitioner Chastity White at Wells Fargo: (1) the #2109 account; (2) the Wells Fargo Bank Account # 1961 ("the 1961 account"); (3) the Wells Fargo Savings Account # 3657; and (4) the Wells Fargo Savings Account # 7601. [Doc. No. 282], 07/21/26 Tr. at 124 (D. Lawhorn); GE 30-4, 30-5, 30-6, 30-7. Those banks records, as detailed below, show that approximately $80,000 of the approximately $105,000 deposited into the 2109 account on February 2, 2022, was still in that account at the time of the Second Search (on July 27, 2022), [Doc. No. 282], 07/21/26 Tr. at 131 (D. Lawhorn); GE 30-9, and that, at most, only approximately $11, 500 could have been moved back to the Petitioner's residence and control before the Second Search.

i. Between February 2, 2022, when $105,457.93 was deposited into Petitioner Chastity White's 2109 Wells Fargo account, and July 27, 2022, the only cash withdrawals from the 2109 account were: (1) a transfer of $24,965.00 to the 1961 account. GE 30-4, 30-5, 30-9, 30-10, 30-11; [Doc. No. 282], 07/21/26 Tr. at 128, 130 (D. Lawhorn); (2) a cash withdrawal of $60; and (2) an in-branch withdrawal of $10,000 on July 27, 2022. GE 30-4, 30-9, 30-11, 30-13; [Doc. No. 282], 07/21/26 Tr. at 128, 132 (D. Lawhorn).

ii. The only cash withdrawals from the 1961 account between February 2, 2022, and July 27, 2022, totaled $11,418 and included: (1) an in-branch withdrawal on April 5, 2022, of $10,000; (2) a cash ATM withdrawal of $1,088; and (3) a jail ATM

withdrawal of $330. GE 30-5, 30-10, 30-11, 30-12; [Doc. No. 282], 07/21/26 Tr. at 130–32 (D. Lawhorn).

iii. As demonstrated by these bank records, of the $195,000 seized during the Second Search on July 27, 2022, only the approximately $11,500 withdrawn from the 1961 account (into which Petitioner Chasity White transferred $24,965 from the 2109 account) could possibly have been part of the $195,000 seized during the Second Search. GE 30-11.[6]

**The Olive Court Residence was knowingly used in furtherance of the Defendants' criminal activities**

15. The Petitioners' children treated the Olive Court residence as a home base for their fraudulent activities, [Doc. No. 282], 07/21/26 Tr. at 32 (A. Curtz), as reflected, by way of example (1) Odyssey Wilhoit's Navy Federal Credit Union account statements from July of 2021 to July of 2022, and her Navy Federal Credit Union Visa rewards statements from November of 2021 to July of 2022, which list the Olive Court Residence as her address (6378 Olive Court, Woodbridge, Virginia 22193-7011), GE 40-2, 40-3, and (2) multiple videos posted on YouTube depicting the defendants with guns and money in front of the Olive Court Residence. GE 40-9, 40-10; [Doc. No. 282], 07/21/26 Tr. at 139, 144–46 (B. Frohnapfel).[7]

[6] The in-branch withdrawal of $10,000 from the 2109 account on July 27, 2022, could not have been part of the $195,000 seized during the Second Search, since that search took place around 6:45AM and lasted until approximately 1:00 PM, both Eric Wilhoit, Sr. and Chastity White were present at the Olive Court residence for the entire search on July 27, 2022, [Doc. No. 282], 07/21/26 Tr. at 112 (D. Holt), and Wells Fargo branches are not open before the Second Search began. *Id.* at 132, 129 (D. Lawhorn).

[7] In June 2020, Petitioner Chastity White sent a link to one such YouTube video to another individual, Tenille Payne. In response, Tenille Payne states, "I don't know how to feel about this. The guns, money while no one has a legitimate job and all in your backyard and it's on Youtube." GE 40-9; [Doc. No. 282], 07/21/26 Tr. at 143–44 (B. Frohnapfel).

16. Petitioners were also on notice that the defendants were using the Olive Court Residence as part of and in furtherance of their fraudulent activities:

i. On at least two occasions, Odyssey Wilhoit sent text messages to Aminata Conteh in December of 2021 directing Conteh to drop off cash at Wilhoit's mother's house. [Doc. No. 282], 07/21/26 Tr. at 141, 147 (B. Frohnapfel); GE 40-11, 40-12. During this same timeframe, Petitioner Chastity White made cash deposits into her Wells Fargo accounts, including a $2,020 deposit on December 8, 2021, into her 1961 account, and a $3,000 deposit on December 8, 2021, a $2,000 deposit on December 13, 2021, and a $1,000 deposit on December 17, 2021, into her 2109 account. GE 30-4, 30-5; [Doc. No. 282], 07/21/26 Tr. at 147–48 (B. Frohnapfel).

ii. Odyssey Wilhoit discussed the cash she kept at the Olive Court residence with Petitioner Eric Wilhoit, Sr., as reflected in the following August 2020 text in which Odyssey Wilhoit asked Petitioner Eric Wilhoit, Sr. to bring her "rubbing alcohol, Q tips . . . my money from under the tv downstairs," among other items:

> Eric Wilhoit, Sr.: You want all this money
>
> Odyssey Wilhoit: No
>
> Eric Wilhoit, Sr.: I don't want to send all this money with your mom I'll bring it when I come if you want it all so how many bands do you want her too bring
>
> Odyssey Wilhoit: 20
>
> Eric Wilhoit, Sr: Ok
>
> Eric Wilhoit, Sr.: Do you want a hundred stack or the other stack
>
> Odyssey Wilhoit: Other
>
> Odyssey Wilhoit: *Picture of High Speed Bill Counter*

GE 40-5; [Doc. No. 282], 07/21/26 Tr. at 140 (B. Frohnapfel); *id.* at 53, 70, 71 (E. Wilhoit, Sr.).

iii. Petitioners also knew that that the Olive Court residence was being used to receive mail addressed to other persons unknown to them. In that regard, and contrary to her deposition testimony, Petitioner Chastity White discussed in text messages with Jeremiah Wilhoit the unusual mail she was receiving.

> Jeremiah Wilhoit: Did that mail come
> Chastity White: No
> Chastity White: These cards came today (Picture of two envelopes one made out to A.M. and the other to S.W. with the address listed for both as 6378 Olive Ct Woodbridge, VA 22193-7011)
> Jeremiah Wilhoit: How many just 2
> Chastity White: Yes
> Chastity White: Hey more packages came here for you now it four packages

GE 40-6; [Doc. No. 282], 07/21/26 Tr. at 138, 143–44 (B. Frohnapfel).

iv. Petitioner Chastity White also discussed the unusual mail coming to the Olive Court residence via text with Petitioner Eric Wilhoit, II.

Eric Wilhoit, II: Wassup na you inna house

> Chastity White: Yes y
>
> Eric Wilhoit, II: Ight I got some mail coming there soon I'm just letting you know it's a couple different names lol but they all going come at the same time
>
> Chastity White: in the mail
>
> Eric Wilhoit, II: Yes please don't throw them away
>
> Eric Wilhoit, II: It's a couple cards
>
> Chastity White: Ok I'll c if they came cuz the mailman came already
>
> Chastity White: Nothing came this week I'll keep you posted
>
> Eric Wilhoit, II: It might not be till next week fr fr

GE 40-7; GE 2 at 34–35; [Doc. No. 282], 07/21/26 Tr. at 139, 143–44 (B. Frohnapfel).

v. Petitioner Chastity White was aware of the videos depicting Odyssey Wilhoit, Jeremiah Wilhoit, and Dejhaun Wilhoit holding firearms and cash at the Olive

Court Residence, GE 40-9, 40-10; [Doc. No. 282], 07/21/26 Tr. at 144–46 (B. Frohnapfel), and in June 2020 sent a link to one such YouTube video to another individual, who clearly recognized the incriminating nature of the activity depicted. *See* GE 40-9 (text message stating responding to Chastity White stating "I don't know how to feel about this. The guns, money while no one has a legitimate job and all in your backyard and it's on Youtube."); [Doc. No. 282], 07/21/26 Tr. at 143–44 (B. Frohnapfel).

vi. The Petitioners have conceded that the firearms and the associated ammunition were subject to forfeiture. [Doc. No. 282], 07/21/26 Tr. at 94.

**Petitioners Disregarded the Court's Orders Directing Them to File Tax Returns**

17. In their depositions, the Petitioners refused to sign a form to authorize the government to obtain their tax returns, GE 2 at 15–16, and on May 28, 2025, the Court ordered Petitioners to provide the government with their personal tax returns from 2005 through 2022, or to provide the government with the appropriate authorization within 10 days allowing the government to obtain them, in addition to information regarding their personal expenses during the same period. The Petitioners were further advised that failure to provide the above information to the government may result in the dismissal of their property at issue. [Doc. Nos. 252, 253].

18. The Petitioners did not provide the requested information, as ordered. [Doc. No. 282], 07/21/26 Tr. at 18–19.

19. No tax returns were seized from the Olive Court Residence on June 10, 2021, [Doc. No. 282], 07/21/26 Tr. at 100–01 (A. Oakley); GE 60-3, or on July 27, 2022. GE 20-4, 20-5.

20. The Internal Revenue Service has no record of returns filed for Petitioner Eric Wilhoit, Sr. or his business E&G LLC for tax years 2015 through 2022. GE 40-19, 40-20.

21. The Internal Revenue Service has no record of returns filed for Petitioner Chastity White for tax years 2020 through 2022. GE 40-21.

22. Chastity White's tax returns from 2015 to 2019 show that her total wages were between $40,375 to $52,844. GE 40-14, 40-15, 40-16, 40-17, 40-18, 40-19.

23. During her deposition, on April 25, 2025, Chastity White stated that she worked for Fairfax Connector, and she stopped working there about four years ago. GE 2 at 13. She stated that she was not currently working. *Id.* at 13–14. During her deposition, when asked "Can you tell me approximately what you were making while you were working there [Fairfax Connector]?", Chastity White responded, "no." *Id.* at 14. During her deposition, when asked whether she could say how much she made in any given year, she said "No. I am unsure." *Id.* at 17–19. She also stated that she was paid via direct deposit. *Id.* at 19–21. During a break in her deposition testimony, Eric Wilhoit, Sr. told Chastity White to plead the Fifth, GE 2 at 37, and Petitioner Chastity White invoked her Fifth Amendment privilege in response to whether she possessed any assets over $500 from May 1, 2020, to July 27, 2022. *Id.* at 32.

24. During his deposition, Eric Wilhoit, Sr. invoked his Fifth Amendment privilege against self-incrimination in response to a question about his yearly income as a barber since 2010. GE 1 at 39:13–40:8.

25. Eric Wilhoit, Sr. testified that his wife has always been employed. She started off working at a company named "Trans" and then she took a job at Fairfax Connector, where she has worked ever since. [Doc. No. 282], 07/21/26 Tr. at 43 (E. Wilhoit, Sr.).

**Petitioners' Income and Assets**

26. At the ancillary hearing, Petitioner Eric Wilhoit, Sr. testified that he worked at Hands In Motion Beauty and Barber Salon from 2000 to 2010 and made between $10,000 to $12,000 annually. *Id.* at 36–40 (E. Wilhoit, Sr.).

27. Since 2010, he has been working at Hands in Motion II, and while working at Hands in Motion Beauty and Barber Salon II, his income fluctuated between $26,000 and $30,000 a year. *Id.* at 36, 37, 57 (E. Wilhoit, Sr.).

28. In their amended claim, Petitioners state that they saved the following amounts: $10,400 yearly from 2005 to 2010 ($52,000 total); $15,600 yearly from 2010 to 2013 ($46,800); $20,800 yearly from 2013 to 2019 ($124,800 total), resulting in a total savings from 2005 to 2019 of $223,600, [Doc. No. 213]; [Doc. No. 282], 07/21/26 Tr. at 46 (E. Wilhoit, Sr.), with Petitioner Chasity White's income contributing 50 percent of the total amount they were able to save each month. [Doc. No. 282], 07/21/26 Tr. at 76.

29. Petitioner Eric Wilhoit, Sr. testified that he stored some of his cash savings at his home in a safe, and some at a relative's home. [Doc. No. 282], 07/21/26 Tr. at 78 (E. Wilhoit, Sr.). In addition to the cash seized during the First Search in June of 2021 and subsequently returned, he had $35,000 in cash that was kept at a relative's house. *Id.*

30. Petitioner Eric Wilhoit, Sr. testified at the ancillary hearing that he had assets in excess of $500, including cars and fishing poles. [Doc. No. 282], 7/21/26 Tr. at 66–68 (E. Wilhoit, Sr.). More specifically:

    i. In December of 2020, Petitioner Eric Wilhoit, Sr. and Odyssey Wilhoit discussed purchasing a vehicle, and Eric Wilhoit, Sr sent Odyssey Wilhoit a link to a 2012 Infiniti QX56 and in March of 2021, Petitioner Eric Wilhoit, Sr. purchased a 2012

Infiniti QX56 VIN: JN8AZ2NE7C9015108 from Leesburg Auto Import in Leesburg, Virginia for a total purchase price of $18,333.61, with $18,000 in cash and $333.61 on a credit card. GE 40-24, 40-25, 40-26; [Doc. No. 282], 07/21/26 Tr. at 53 (E. Wilhoit, Sr.); *id.* at 140, 143 (B. Frohnapfel).

ii. As of July 9, 2026, Petitioner owns four vehicles, and there are no liens on those vehicles. [Doc. No. 282], 07/21/26 Tr. at 36, 42, 72.

31. Eric Wilhoit, Sr. and Chastity White live at the Olive Court Residence. GE 1 at 10. There is a mortgage on the Olive Court Residence, on which the Petitioners pay approximately $2,000 a month. GE 2 at 8–9.

32. Chastity White and Eric Wilhoit, Sr. have received unemployment. GE 40-22, 40-23.

## III. CONCLUSIONS OF LAW[8]

**1. Petitioners lack statutory standing to challenge any determination of forfeitability made in the Court's preliminary order of forfeiture.**

Under 21 U.S.C. § 853(n)(6), the Petitioners must establish their superior legal interest in the $195,000 before it became forfeitable because of criminal activity. *United States v. Oregon*, 671 F.3d 484, 491 (4th Cir. 2012); *Cox*, 575 F.3d at 358; *United States v. Schecter*, 251 F.3d 490, 494 (4th Cir. 2001) (to succeed with a third-party claim, a third party must have had an interest in the property before it became forfeitable or must have acquired it later as a bona fide purchaser). The United States has move to strike the Petition on the grounds that "petitioners cannot have a superior pre-existing interest in the $195,000 because the Court has already found that it constitutes proceeds of the offenses," and they are "not entitled to have the court revisit any determination that a certain piece of property was forfeitable as, for example, proceeds of the crime or facilitating

[8] Any statements of fact in this Section not included in the Findings of Facts Section constitute findings of fact by the Court.

property." [Doc. No. 284] at 19–21.

Although the Fourth Circuit does not appear to have addressed this issue explicitly, most other Circuits agree that a third-party petitioner, such as the Petitioners here, lacks statutory standing to relitigate the forfeitability of the property in the ancillary proceeding because that right belongs to the criminal defendant alone.[9] Instead, "the sole avenue for a third party to assert an interest in forfeitable property" is the "ancillary proceeding" under § 853(n), whose scope is limited, as reflected in 21 U.S.C.§ 853 (n)(6)(A)–(B), to whether the petitioner's interest was "superior" to the defendant's interest in the property at the time of the commission of crime, or whether the third-party petitioner was a bona fide purchaser for value. *United States v. Fabian*, 764 F.3d 636, 638 (6th Cir. 2014); § 853(n)(6)(A)–(B).[10] In other words, "'innocent' third parties can hang on to the property only if they show that they really did get it innocently, either by paying good money for it or getting it before it was criminally tainted." *United States v. Hallinan*, 75 F.4th 148, 150 (3d Cir. 2023).

Petitioners argue that the forfeited currency "did not derive from any type of criminal

[9] *See United States v. Hallinan*, 75 F.4th 148, 150 (3d Cir. 2023) (holding that third parties "cannot challenge whether the property was rightly forfeited; only the defendant can do that"); *United States v. 101 Houseco*, LLC, 22 F.4th 843, 849 (9th Cir. 2022) ("Congress has allowed only two such challenges, which do not include a claim that the property was not forfeitable in the first place."); *United States v. Fabian*, 764 F.3d 636, 638 (6th Cir. 2014) (rejecting petitioner's argument that the properties recited in his petition lacked any "nexus" to fraud because "§ 853(n) does not permit 'relitigation' of the district court's antecedent determination that an item of property is subject to forfeiture); *United States v. Davenport*, 668 F.3d 1316, 1321 (11th Cir. 2012) (third party cannot challenge the forfeitability of the property in the ancillary proceeding, rather ownership is the issue); *United States v. Porchay*, 533 F.3d 704, 710 (8th Cir. 2008) (once the government establishes the forfeitability of the property in the criminal case against the defendant, "there is no provision in § 853(n) to relitigate the outcome of those proceedings"); *United States v. Andrews*, 530 F.3d 1232, 1236–37 (10th Cir. 2008) ("a third party has no right to challenge the preliminary order's finding of profitability," rather the only issue in the ancillary proceeding is ownership, which is a complete defense to the forfeiture).

[10] Many courts in the Fourth Circuit, including in the Eastern District of Virginia, have followed the majority rule discussed above. *See, e.g., United States v. Bangiyev*, 2021 WL 5304187 (E.D. Va. Nov. 15, 2021) (collecting cases holding that third parties cannot relitigate forfeitability), *aff'd in part, vacated in part, remanded sub nom, United States v. Bangiyev*, 75 F.4th 445 (4th Cir. 2023); *United States v. Wanger*, No. 4:15-cr-28, 2017 WL 6513420, at *2 (E.D. Va. Dec. 19, 2017) ("In the proceeding, the third-party petitioner cannot challenge the legality of the forfeiture ordered. The only purpose of the proceeding is to determine whether any third party has a legal interest in the forfeited property.") (cleaned up).

activity or criminal enterprise as engaged in by him, his children or nephew." [Doc. No. 283] at 9; *see also* [Doc. No. 198]. But in substance, Petitioners seek to invalidate the Court's original forfeiture order on the grounds that the seized Property was not the proceeds from, and therefore not "tainted" by, the defendants' criminal activities, an issue beyond the scope of an ancillary proceeding. As other Circuits have recognized, arguments about whether property properly constituted criminal proceeds "goes to the property's forfeitability, which is beyond the ancillary proceeding." *Hallinan*, 75 F.4th at 150. For these reasons, the Petitioners lack statutory standing to challenge the Court's prior determination reflected in the Forfeiture Orders entered under Criminal Rule 32.2(b)(2) that the $195,000 is subject to forfeiture as the proceeds of the defendants' criminal activity. *See United States v. Hooper*, 229 F.3d 818, 821–22 (9th Cir. 2000) (explaining that proceeds of the crime do not exist before the commission of the crime, thus no third party could possibly have a superior pre-existing interest in proceeds under section 853(n)(6)(A)); *United States v. Allmendinger*, No. 3:10-cr-248, 2012 WL 966615, at *2 (E.D. Va. Mar. 21, 2012) ("It is clear that Defendant [] purchased the [property] with [fraud scheme] proceeds, so [the petitioner to whom the property was gifted] could not have acquired her interest in the [property] before the commission of the offense.").

Nevertheless, even if Petitioners had standing to challenge the Court's finding, as reflected in the Forfeiture Orders, Petitioners are not entitled to the relief sought based on their discovery failings and the overwhelming evidence that the $195,000 constitutes proceeds from the defendants' fraud schemes.

**2. Petitioners' failure to comply with Court ordered discovery bars them from seeking any relief under their Petition.**

In their Motion to Strike, the Government seeks dismissal of Petitioners' claims as to the $195,000 forfeited currency for failure to comply with discovery obligations. [Doc. No. 247].

Section 853(n) requires a third party asserting an interest in property to "set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought." 21 U.S.C. § 853(n)(3). "Ancillary forfeiture proceedings that arise out of criminal cases are civil in nature and are thus governed by the Federal Rules of Civil Procedure," including discovery rules. *See United States v. Negron–Torres*, 876 F. Supp. 2d 1301, 1304 (M.D. Fla. 2012) (internal citations omitted). The Federal Rules of Civil Procedure permit parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence, and it "need not be admissible at . . . trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *See* Fed. R. Evid. 401.

As detailed above, Petitioners' core contention in this case is that they saved the seized $195,000 during the period 2005 to 2022 and that this money was not derived from defendants' fraudulent schemes. The Government was therefore entitled to relevant and discoverable information about Petitioners' income and expenses during this period, Fed. R. Civ. P. 26(b)(1), and the Court ordered that it be produced, *see* [Doc. No. 253]. Petitioners did not do so.

Petitioners' discovery responses as it relates to their income and expenses were deficient without any showing by the Petitioners that they made reasonable efforts to collect and share discoverable information both before and after the Court ordered them to do so. Specifically, Petitioner White testified that although she was not sure how much she made while working at Fairfax Connector, she received her salary through direct deposit in one bank account; however, she admitted that she made no attempt to obtain these bank statements at the time of her deposition.

GE 2 at 18–19 ("Q: Did you make an attempt to get those statements from that account? A: No."). When Petitioners produced a limited subset of Petitioner White's bank statements later in discovery, Petitioners only provided the Government with the first page of the bank statement, which omits the transaction information that would show White's earnings and living expenses. At their depositions, they refused to answer questions about their incomes and expenses based on their Fifth Amendment privilege and even after the Court ordered the Petitioners to produce their individual tax returns or authorize the Government to obtain them,[11] Petitioners refused to do so. Without additional information, the Petition is merely an unsupported, conclusory assertion that the money constitutes their savings without affording the Government an opportunity to adequately review and test their claim.

Because of these deficiencies and the Petitioners' failure to obey the Court's discovery orders, the Court finds that the sanction of striking Petitioners' monetary damage is warranted under Rule 37. *See* Fed. R. Civ. P. 37(b)(2)(iii); *see also United States v. BCCI Holdings (Luxembourg), S.A.*, 169 F.R.D. 220, 223 (D.D.C. 1996) ("Because the [Petitioners'] failure [has blocked] the United States' ability to litigate the merits of [Petitioners'] [c]laim, a less severe sanction would not be effective."). Therefore, the Court grants the Government's Motion to Strike.

**3. The $195,000 constitutes the proceeds from criminal activity.**

Petitioners contest the forfeiture order on the basis that they have "a legal right, title, or interest in the" that was "superior" to the interest of the defendants at the time of the commission

[11] In making this ruling, the Court considered the qualified privilege that applies to tax returns in this district and determined that the tax returns at issue were discoverable to the matters in dispute and needed because the information was not ascertainable by the Petitioners from another source. *See Interstate Narrow Fabrics, Inc. v. Century USA, Inc.*, No. 1:02CV00146, 2004 WL 444570, at *2 (M.D.N.C., Feb. 24, 2004). If Petitioners have another source from which they could share this information with the government, it was their burden to identify this alternative source, *id.*, but they did not do so.

of the acts giving rise to forfeiture.[12] Specifically, Petitioners allege that the $195,000 in U.S. Currency constitutes their life savings and not proceeds of the wire, mail and bank fraud conspiracies to which their children pled guilty. [Doc. No. 198]. Petitioners have failed to carry their burden to prove, by a preponderance of the evidence, that they had a prior ownership interest in the $195,000 forfeited currency.

The wire fraud conspiracy for which the Petitioners' children pled guilty spanned from May of 2020 to January of 2022, and the bank fraud conspiracy period took place from December of 2020 to March of 2021. [Doc. No. 65]. During those time periods, the Olive Court Residence was a pivotal location for the underlying criminal activity and was routinely used to as a "home base," [Doc. No. 282], 07/21/26 Tr. at 32 (A. Curtze), where personal items were stored, and as reflected in Eric Wilihoit, II's statements, where fraud proceeds were stored. See GE 60-13, 20-21, 40-2, 40-3, 40-5 ("everybody done did wrong either to dad house around dad house in dad house." GE 40-4 at 2300. Multiple videos posted on YouTube showed the defendants at the Olive Court Residence holding cash and firearms. GE 40-10. Multiple text between members of the conspiracy and the Petitioners talk about storing cash at the Olive Court Residence. GE Ex. 40-4, 40-8, 40-5. And another coconspirator, Aminata Conteh, admitted that "[o]n at least two occasions, Odyssey directed the defendant to provide the cash to Odyssey's mother [Petitioner Chastity White]. The defendant knew that the funds were illegally obtained and that Odyssey had no legal source of income as she was not employed." *United States v. Aminata Conteh*, Case No. 1:24-cr-133, ECF No. 37 (Plea Agreement). Law enforcement also found evidence of the defendants' fraud

[12] Petitioners do not claim, nor could they, that they were bona fide purchasers for value of the $195,000 under 21 U.S.C. § 853(n)(6)(B), which requires there to have been a purchase or transaction to acquire the property interest. *United States v. Timley*, 507 F.3d 1125, 1130-31 (8th Cir. 2007) (a successful § 853(n)(6) petition includes a bona fide purchase for value); *United States v. Allmendinger*, No. 3:10-cr-248, 2012 WL 966615, at *2 (E.D. Va. Mar. 21, 2012).

schemes at the Olive Court Residence during both the 2021 and 2022 searches, including mail from the Virginia Employment Commission (VEC), blank check stock, and economic impact payments. GE 60-1, 20-8, 20-9, 20-10, 20-11, 20-12, 20-13, 20-14, 20-15, 20-16, 20-17, 20-25; [Doc. No. 282], 07/21/26 Tr. at 115 (D. Holt). Both Eric Wilhoit, II and Jeremiah Wilhoit spoke with their mother about the VEC letters coming to the Olive Court Residence. GE 40-6. In total, the address of the Olive Court residence was used in connection with 21 claimants which resulted in $206,880 being paid by the Virginia Employment Commission. [Doc. No. 158].

Petitioners also claim that the majority of the cash seized during the Second Search on July 27, 2022, is the same cash seized during the First Search on June 10, 2021, which was ultimately returned to Petitioners. GE 1 at 18; GE 2 at 12–13. In that regard, Petitioner Eric Wilhoit, Sr. testified that, of the approximately $105,00 that was returned to Petitioner Chastity White's Wells Fargo checking account after the June 2021 seizure, around $75,000 to $80,000 was then withdrawn in cash and placed into the safe at the Olive Court Residence. [Doc. No. 282], 07/21/26 Tr. at 78–80 (E. Wilhoit, Sr.). However, as reflected in the bank records, only $11,500 of the cash seized from the Olive Court residence in July of 2022 could have possibly been the same cash seized in June of 2021 because on July 27, 2022, the day of the FBI search, the large majority of the money was still in the 2109 account. [Doc. No. 282], 07/21/26 Tr. at 131–32 (D. Lawhorn). Therefore, the Petitioners' bald assertion that the cash seized in 2021 and 2022 is the same is directly contradicted by the evidence presented by the government at the ancillary hearing.

Further, the Petitioners' evidence does not explain how they were able to accumulate approximately $300,000 in cash (as reflected in the $113,000 seized during the First Search and the $195,000 seized during the Second Search). After years of litigation, for the first time, the Petitioners—who have the burden in this proceeding—introduced at the hearing the testimony of

Eric Wilhoit, Sr. concerning his annual income. He testified that from 2000 to 2010 he made between $10,000 and $12,000 and from 2010 onward he made approximately $26,000 to $30,000. [Doc. No. 282], 07/21/26 Tr. at 37, 57 (E. Wilhoit, Sr.).[13] At the ancillary hearing, the Petitioners introduced no evidence about Chastity White's annual income and did not clarify the conflicting evidence about her employment at Fairfax Connector. *Compare* [Doc. No. 282], 07/21/26 Tr. at 43 (E. Wilhoit, Sr.) *with* GE 2 at 13–14. The evidence showed that neither Eric Wilhoit, Sr., nor his business, E&G LLC, filed taxes from 2015 to 2022. GE 40-19, 40-20.

In sum, Petitioner Eric Wilhoit, Sr.'s overall explanation of how he had accumulated the $195,000 that was seized was not credible and contradicted by the evidence. In that regard, he testified that $80,000 was from the return of the $105,000 previously seized and deposited into Petitioner White's Wells Fargo account, an additional $35,000 had been retrieved from a friend who was holding that money for him, and he earned the remaining $80,000 between June of 2021 and July of 2022, by waking up early on Sundays and working long hours, in what Eric Wilhoit, Sr characterized as a "binge" to "sav[e] money." [Doc. No. 282], 07/21/26 Tr. at 79–82 (E. Wilhoit, Sr.). But the record shows that at most $11,500 was retrieved from the returned $105,000, and even that amount was likely proceeds from the defendants' fraudulent schemes. Petitioners presented no corroborating evidence about the money they claim was retrieved from Eric Wilhoit, Sr.'s friend, or how Eric Wilhoit, Sr. was able to earn $80,000 in little more than a year when he had never earned, by his own testimony, more than $30,000. Petitioners have not proven as required that the seized $195,000 in U.S. currency constituted their savings.

[13] When asked about his annual income at his deposition, Eric Wilhoit, Sr. invoked his Fifth Amendment privilege against self-incrimination. GE 1 at 39–40.

## IV. CONCLUSION

For the above reasons, Petitioners do not having standing to relitigate whether the $195,000 seized during the Second Search was forfeitable and properly included within the Forfeiture Orders and in any event are precluded from obtaining any relief as requested in their Petition based on their failure to comply with Court ordered discovery and otherwise failing to provide requested discovery as well as their inability to establish that seized $195,000 was not the proceeds of criminal activity. Because the record is clear that the $195,000 constitutes proceeds of the defendants' fraudulent schemes, the Petitioners cannot have a pre-existing interest in the funds; nor do they claim that in some fashion they are bona fide purchasers for value; and consequently, they cannot prevail under either of the sole grounds for recovery of forfeited property in 21 U.S.C. § 853(n)(6). For these reasons, it is hereby

**ORDERED** that the Government's Motion to Strike [Doc. No. 247], be and the same hereby is, **GRANTED**; and it is further

**ORDERED** that the Petition for interest in forfeited property [Doc. No. 198], be and the same hereby is, **DENIED** and **DISMISSED**; and it is further

**ORDERED** that the Government present to the Court for entry a Final Order of Forfeiture reflecting the results of the ancillary proceeding.

October 7, 2026
Alexandria, Virginia

/s/
Anthony J. Trenga
Senior United States District Judge